Henry **NICKELL**, Plaintiff–Appellant,

v.

**MEMPHIS LIGHT, GAS & WATER DIVISION, Defendant–Appellee.**

No. 01–6253.

United States Court of Appeals,
Sixth Circuit.

Sept. 22, 2003.

88

Kathleen L. Caldwell, Taylor, Halliburton, Ledbetter & Caldwell, Jeffery L. Atchley, Norwood, Howard & Atchley, Memphis, TN, for Plaintiff–Appellant.

Elijah Noel, Jr., Harris, Shelton, Dunlap, Cobb & Ryder, Memphis, TN, for Defendant–Appellee.

Before BOGGS and DAUGHTREY, Circuit Judges; and OBERDORFER, District Judge.*

---

* The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

PER CURIAM.

Appellant Henry Nickell appeals from the District Court's dismissal of his Title VII retaliation claim. Nickell alleges that Memphis Light, Gas & Water Division retaliated against him after he filed a suit alleging reverse discrimination in a promotion. Nickell also claims that Memphis Light's alleged retaliatory actions led to his constructive discharge. The District Court dismissed Nickell's claims on the grounds that he failed to present evidence to overcome Memphis Light's articulated legitimate reasons for each of its actions and failed to show that several claimed instances of retaliation constituted adverse employment actions. For the reasons that follow, we **AFFIRM** the District Court.

## I. BACKGROUND

### A. Facts

On December 18, 1997, Nickell filed an EEOC charge alleging that Memphis Light discriminated against him when it failed to promote him to the position of Vice President of Operations. A district court dismissed his discrimination claim on January 3, 2000.

Nickell's present action asserts that Memphis Light took certain retaliatory actions against him as a result of his 1997 discrimination suit. Specifically, Nickell alleges that Memphis Light detrimentally changed his responsibilities and duties as Manager,[2] gave him a less favorable performance review, failed to promote him to

Vice President of Finance, and attempted to diminish his influence in his department while he was out on extended sick leave. Nickell asserts that these alleged discriminatory actions led to his constructive discharge on April 21, 2000. Below, we discuss Nickell's allegations of retaliatory discrimination in detail.

In early 1997, Nickell worked under the direct supervision of Sandy Novick, the Vice President of Operations. Novick left Memphis Light in March 1997. Before leaving the company he completed an employee evaluation for Nickell and gave him a performance rating of "P2," which signifies that the employee has "met and at times exceeded the requirements of his position." In the year 1996, he had rated Nickell at a "P1" level, the highest rating an employee may receive on a performance evaluation.

Alonzo Weaver, the Vice President of Operations replacing Novick, completed Nickell's 1997 performance evaluation in February 1998. He gave Nickell a rating of "P2+," the plus indicating that Nickell "had been particularly helpful to [him] during the period for which [he] was then evaluating him." Nickell complained to Weaver regarding the rating stating that he believed he deserved a rating of "P1," because he felt he was performing many of the operations of the vice president position for Weaver during 1997. Weaver did not adjust the evaluation to a "P1" rating as requested. As a result of the positive

---

**2.** In January 1997, Herman Morris became the interim President of Memphis Light, and he was appointed President in August 1997. Nickell argues that Morris made several changes that affected his duties, and that these changes were retaliatory in nature. However, Nickell's claims of retaliation regarding changed duties occurred prior to his December 18, 1997 charge of discrimination. For example, Nickell claims that he was as-

signed additional regulatory duties in March 1997 and that he was excluded from "TVA [Tennessee Valley Authority] Big Five" meetings when Morris began attending these meetings in April 1997. Memphis Light argues, correctly, that these actions occurring before Nickell engaged in protected activity cannot properly form the basis of his retaliation claim. These claims, therefore, will not be discussed in detail.

"P2+" evaluation, Nickell received a merit pay raise of 4.7% in 1998.

In February 1998, Nickell applied for the position of Vice President of Finance. The announcement prepared by human resources indicated that "Certified Public Accountant or Master of Accountancy or Master of Business Administration" was preferred for the position. Forty-two applicants applied for the position and twelve, including Nickell, were interviewed during the first round of interviews. Memphis Light then narrowed the pool of candidates to six final interviewees, all of whom had either a Certified Public Accountant certificate or a Masters of Business Administration degree. Nickell did not hold either degree and did not receive an interview in this final round. Memphis Light selected John McCullough for the position; a candidate with an engineering degree, twenty years experience in the Memphis Light Finance, Budget and General Accounting area and a Master of Business Administration degree.

In April 1998, Alonzo Weaver requested that Nickell prepare an "off-system marketing proposal" that dealt with the formation of a for-profit subsidiary to market natural gas, electricity and supply management expertise on a regional or national basis. Nickell prepared an outline that Weaver approved but only after what Nickell described as an uncharacteristically detailed criticism. Nickell also alleges that Larry Thompson, a Senior Vice President and Chief Operating Officer, advanced the date of the proposal presentation, refused to give him additional personnel to draft the proposal, and required Nickell's department to draft the proposal more quickly, all in retaliation for his discrimination claim.

As a further example of retaliation, Nickell alleges that Memphis Light attempted to rotate him out of his Supply Planning position. Memphis Light occasionally offers "rotations" to employees "whereby employees are temporarily reassigned to other duties." In January or February 1999, Memphis Light, through Larry Thompson, proposed that Nickell rotate positions with Bob Mensi, the Manager of Systems Operations. Memphis Light was considering merging Systems Operations and Supply Planning as part of its "Mission 2000" plan. Thompson explained that rotations "are beneficial to employees . . . [because they] broaden the rotated employees' exposure to activities within the Division, expose the employees supervised by the rotated employees . . . to different management styles, and develops [sic] a pool of persons within the Division with diverse experiences that will provide a reservoir of talent that can be used when other positions with the Division need to be filled." Thompson avers that he proposed the rotation because "he felt it would benefit Nickell's chances for career advancement" should the departments merge. Nickell declined the rotation.

Nickell also alleges that Memphis Light acted in retaliation when it approached several of his Supply Planning staff and offered them rotations in other departments. In 1998, on two occasions, Memphis Light offered to rotate William Bullock to a position outside of Supply Planning. Bullock declined the first rotation, and the second rotation never materialized.

On April 6, 1999, Nickell took a sick leave for situational stress-related symptoms. Nickell claims that while he was on sick leave Memphis Light took several retaliatory actions against him in order to undermine his authority as the Manager of the Supply Planning Department. Nickell was on sick leave from April 6, 1999, until he resigned on April 21, 2000.

**Acting Manager:** While on sick leave, Nickell appointed Walter Stevens, a Level IV Engineer, as Acting Manager of Supply Planning. Stevens would provide Nickell with weekly written reports regarding the activities of the department. In Summer 1999, Stevens asked Alonzo Weaver to remove him from the position of acting manager because he believed that it was distracting him from performing his normal duties as a Level IV Engineer. After Stevens' request to be relieved, Weaver, without consulting Nickell, appointed William Bullock, also a Level IV engineer, as the new Acting Manager of Supply Planning.

At that time, Bullock asked Weaver if he should continue to send weekly reports to Nickell. Weaver, previously unaware that such reports were being sent to Nickell, told Bullock to continue to send the reports, but also to provide him with a copy of each report. Weaver also asked the Bullock provide him with all of the previous reports sent to Nickell "because he thought such reports would also be useful in keeping [him] aware of activities in [Supply Planning], particularly while it was being led by an Acting Manager." Weaver also instructed Bullock to keep him aware of any communications between Nickell and Supply Planning personnel "because [he] was also uncertain of the frequency of contact [and] of the extent to which such contacts interfered with Mr. Nickell's sick leave ... and [because he] had no way of evaluating the extent to which instructions or communications from Mr. Nickell to [Supply Planning] employees ... were consistent with or conflicted with [Memphis Light] strategy and senior management decisions...."

**Security Alert:** Nickell continued to keep communication open with his department while he was on sick leave. Nickell would contact Jamie Weigandt, a secretary in Supply Planning, and she acted as the liaison between the department and Nickell. Weigandt told Bullock that she was uncomfortable with her role and felt she was "caught in the middle," often receiving contrasting instructions from Memphis Light and Nickell. After Weigandt expressed her concerns, she was contacted by Thomas Jackson, a Manager for Facilities Management. During that conversation Weigandt expressed that she felt uncomfortable with Nickell.[3] Jackson issued a security alert for Nickell, on the basis that "anytime an employee has made another employee or employees uncomfortable ... [and] the discomfort is reasonable, a Security Alert will be circulated to security checkpoints, requiring that Jackson ... be notified when such employee is on [Memphis Light's] premises." The security alert was kept at security checkpoints and only available to security personnel. Nickell was not prevented from coming onto the premises. The code locks for the Supply Planning department were also changed as part of the security alert. Nickell became aware of the security alert

---

**3.** Ms. Weigandt's testimony is not entirely clear regarding whether she felt unsafe or merely uncomfortable in her position as liaison. She testifies that she felt "apprehensive" about the situation but not concerned for her personal safety. However, she also testified that "there was something posted on the bulletin board about workplace violence, and I indicated, after it was pointed out, there were several things notated in that announcement ... that some of the others in the office said might apply the Henry Nickell. And after much talk, I felt apprehensive." She continued that "the whole situation was volatile at the time. It seemed that it could have gotten out of hand. That, I just felt apprehensive not specifically for me, but for the whole situation." She indicates that upper management misunderstood her that she "felt concerned and apprehensive" but never feared for her own safety.

while he was on sick leave.[4] Nickell never returned to the premises during his sick leave and accordingly, the security alert was never activated.

**Car Allowance:** Prior to, and during the first part of his sick leave, Nickell received a car allowance from Memphis Light. In October 1999, Memphis Light terminated his allowance based on Policy 23–08 ("Reduction of Allowance Due to Absence"). That policy states: "If the employee has not reported to work after 90 calendar days, the matter will be reviewed by the vice president responsible for the Transportation Department and appropriate vice president, and determination made as to continuance of the fixed cost allowance or removal from allowance. The employee will have his/her full allowance restored, if interrupted or reduced, upon return to work." Alonzo Weaver and Wade Stinson, the Vice President of Construction and Maintenance, concluded that while Nickell was on sick leave and not commuting to the office, he was no longer entitled to receive a car allowance.

**Pension Calculation:** Nickell resigned from his position on April 21, 2000. The Risk Management Department calculated Nickell's pension benefits and determined that he was employed at Memphis Light for "19 years, 11 months and nineteen days." Brenda Greene, the Manager of the Risk Management Department filed an affidavit setting forth the method used for the calculation of retirement benefits. Nickell argues that he was a Memphis Light employee for twenty years and that upper management acted after his constructive discharge to recalculate his years of service in such a way to deny him substantial pension benefits. Nickell does not specifically offer any evidence of how the calculation described by Greene is er-

roneous or how it affected his pension benefits.

**B.  Procedural History**

The District Court dismissed Nickell's action after finding that Memphis Light submitted un-refuted legitimate, non-discriminatory reasons for each of its employment actions and that many of Nickell's allegations of discrimination did not constitute adverse employment actions. Nickell then filed the present appeal.

## II.  DISCUSSION

We review a district court's grant of summary judgment *de novo. See Dudley v. Eden,* 260 F.3d 722, 725 (6th Cir.2001). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c). "Put differently, this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993). The court views the evidence and any reasonable inferences that may be drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**A.  Retaliation**

To establish a prima facie case of retaliation, a plaintiff must demonstrate that:

---

4.  Mr. Nickell's counsel provided this information to the Court after oral argument, by letter dated May 14, 2003, with a copy to counsel for the defendant. It was not disputed.

(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *See Ford v. General Motors Corp.*, 305 F.3d 545, 552–53 (6th Cir.2002). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory rationale for treating the plaintiff in the manner challenged. *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To prevail in a case where an employer has produced sufficient evidence of a non-discriminatory reason for its action, the plaintiff must produce credible evidence that the reason offered by the defendant is a mere pretext for unlawful retaliation. *Id.* at 256.

We conclude that many of Nickell's claims of retaliatory discrimination are not actionable because he has failed to establish that he suffered an adverse employment action. In order to demonstrate that an adverse employment action has occurred, a plaintiff must establish that employer conduct caused a "materially adverse change in the terms and conditions of employment." *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999). This Circuit has consistently ruled that *de minimis* employment actions are not materially adverse and, thus, not actionable. *See, e.g., id.*

■ Nickell is unable to demonstrate that the "P2+" performance review received from Weaver, the suggested rotation with Systems Operations, the criticism received during the presentation of the Off–System Marketing Proposal, or the request of Weaver to be kept informed of communications going to Nickell while he was on sick leave, were adverse employment actions. None of these actions were followed by a material adverse change in the terms and conditions of Nickell's employment. In fact, Nickell received a merit raise after receiving the "P2+" evaluation. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000) (concluding that an employer's evaluation of "very good" instead of "excellent" is not an adverse employment action).

■ Nor is Nickell able to overcome Memphis Light's articulated legitimate, non-discriminatory reasons for each of its actions. With regard to the promotion for Vice President of Finance, Memphis Light stated a preference for candidates with a CPA or MBA. Nickell did not have either of the desired degrees. The six final candidates all had the preferred degree and John McCullough, the person hired for the position, held an MBA. Nickell provided no evidence to establish that this preference was merely pretext.

■ Nickell also fails to demonstrate that the security alert issued by Memphis Light was taken in retaliation for his previous discrimination suit. Ms. Weigandt's testimony indicates that she expressed some "apprehension" over her contact with Nickell especially after she reviewed a posting regarding workplace violence.

Thomas Jackson states that he decided to issue a security alert requesting that he, or one of his colleagues, be notified should Nickell appear on the premises. Nickell has not presented any affirmative evidence that he suffered any consequences from the alert, or more important, that Jackson's reason for issuing the security alert is merely pretext.

Memphis Light stated that Nickell ceased receiving a car allowance because employees who had not returned to work after ninety days or more were no longer automatically eligible for a car allowance. Nickell did not travel to work during the period of his sick leave and Memphis Light may have reasonably determined that a car allowance was no longer appropriate.

■ Additionally, Nickell has not alleged facts to refute Memphis Light's articulated basis for his pension calculation. Brenda Greene, a member of Memphis Light's Risk Management department set forth, in an affidavit, the arithmetic calculations, based on Risk Management's established policy, used to calculate Nickell's time at the company. Nickell has presented no evidence that those calculations are incorrect or false, or that he was adversely affected in his pension benefits as a result of that calculation.

## B. Severe and Pervasive Harassment

Nickell argues that while each of the alleged acts may not appear to be retaliatory in isolation, when the "totality of the circumstances" is examined, the actions constituted retaliatory harassment. He contends that when the acts are viewed in the cumulative a clear question of material fact exists as to whether he was forced to work in an abusive or offensive work-related environment.

■ In order to establish a retaliatory harassment claim, an employee must show the following: "(1) the employee is a member of a protected class, (2) the employee was subject to unwelcomed retaliatory harassment, (3) the harassment was based on the employee's protected activity, (4) the harassment created a hostile work environment, and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999). In order to allege a hostile work environment, a plaintiff must demonstrate that the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In this case, even when viewing the alleged actions in the cumulative, no reasonable trier of fact could find that the actions taken by Memphis Light created an abusive or hostile work environment for the plaintiff.

## C. Constructive Discharge

An employee is constructively discharged if he resigns because working conditions have "become so difficult or unpleasant" that a reasonable person in his shoes would feel compelled to resign. *See Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir.1987) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982)). In determining whether an employee has been constructively discharged we look to both the reasonableness of the employee's belief that resignation was necessary, an objective standard, and the intent of the employer, a subjective inquiry. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002). The employer must have acted with a discriminatory intent with the goal of forcing the plaintiff to resign. *Id.*

Additionally, a plaintiff must demonstrate not only intent, but also "other aggravating factors," demonstrating a continuous and severe pattern of discrimination. *Yates,* 819 F.2d at 637. Here, as discussed above, where Nickell is unable to demonstrate a pervasive pattern of retaliation, he is unable to show "aggravating factors" necessary to support his constructive discharge claim. Accordingly, we affirm the dismissal of that claim.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the decision of the District Court.