**Lyla K. WEIGOLD, Plaintiff–Appellant,**

v.

**ABC APPLIANCE COMPANY, et al., Defendants–Appellees.**

No. 02–1965.

United States Court of Appeals, Sixth Circuit.

July 7, 2004.

Jamil Akhtar, Akhtar, Sucher & Ebel, Troy, MI, for Plaintiff–Appellant.

Robert L. Duty, Dykema Gossett, Bloomfield Hills, MI, for Defendants–Appellees.

Before: COLE, DAUGHTREY, Circuit Judges; and POLSTER, District Judge.*

* The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

Polster, District Judge.

Plaintiff–Appellant Lyla K. Weigold appeals the district court's grant of summary judgment in favor of Defendants–Appellees ABC Appliance Company ("ABC"), ABC store manager Jay Cyplik, and ABC regional manager Randy Novenske. Weigold sued Defendants–Appellees alleging that she was subjected to a hostile work environment based on her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, and Michigan's Elliott–Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws Ann. § 37.2202 et seq., and that she was constructively discharged in violation of Title VII, the ELCRA and the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2612–2654. The district court concluded that Weigold failed to produce any evidence that Defendants–Appellees interfered with her FMLA rights, discriminated against her on the basis of her gender or tolerated a sexually hostile work environment. For the following reasons, we **AFFIRM**.

## I.

ABC owns and operates retail stores in Michigan that sell appliances and electronics. Each store has one manager, two assistant managers (one for the major appliances department and one for the audio visual department), sales associates in each department and administrative personnel.

On January 16, 1995, Lyla Weigold was hired as a sales associate in the major appliances department at ABC's Fort Gratiot, Michigan, store. Weigold listed Scott Kerr, her son-in-law who was a sales associate at the Fort Gratiot store, as a reference.

In 1997, Kerr became assistant manager for major appliances and Weigold's immediate boss. Around this time, Kerr and Weigold's daughter were undergoing an acrimonious divorce and child custody battle. This family dispute created friction at the work place and store manager Jay Cyplik was forced to counsel both Weigold and Kerr about their inappropriate behavior on more than one occasion. Weigold claims that most of her colleagues sided with Kerr because he was their boss. For instance, Weigold was berated by sales associate Jim Curtis, a friend of Kerr's, who told Weigold in front of customers that nobody liked her or wanted to work with her and called her a "f . . . ing bitch." JA 149. Weigold testified that the epithet was unprovoked and that it was common for Curtis to denigrate other sales associates as well. When she complained about Curtis's conduct to one of her supervisors, Curtis was reprimanded and the conduct came to a swift halt. Weigold testified that she was satisfied with management's response. Not long thereafter, Kerr left ABC and the work atmosphere improved.

In July 1998, Cyplik promoted Weigold to assistant manager of the audio visual department, replacing the male audio visual assistant manager who left the Fort Gratiot store. Although Weigold would have preferred to remain in the major appliances department, she agreed to take the position to help Cyplik out.

One year later, when major appliances assistant manager Jim Freeman left the Fort Gratiot store, Cyplik promoted Weigold to that position over the applications of at least two male sales associates. ABC transferred Dennis Robinson, a sales associated at its Flint, Michigan store to the Fort Gratiot store to replace Weigold as assistant manager of the audio visual department. Weigold asserts that there was resentment towards her as a result of her promotion and that Cyplik counseled her to "leave the guys alone on the majors floor, that they knew what to do with their job and just to leave them be, and that if I

would just work at getting my numbers up the respect would come."[1] JA 66.

Robinson, who was new to the store and friendly to Weigold, recognized this resentment. Unbeknownst to Weigold, Robinson approached the employees with whom Weigold had problems to find out why they disliked her, and compiled a list of their grievances. When Robinson approached Weigold with the list, she read just enough of it to see that one of the listed items had the word "bitch" in it. She became irate with Robinson, ripped up the list and complained to Cyplik and ABC's Vice President of Sales, Michael Bone, both of whom ordered Robinson to destroy the list. Weigold later testified that she did not feel that Robinson had any ulterior motive in generating the list and "felt he was trying to help." JA 155. She also testified that she was satisfied with management's response to her complaint and that the subject was never mentioned again.

Weigold's management style left something to be desired. For example, on two occasions, Cyplik had to counsel her about making inappropriate remarks to two female employees regarding personal matters in front of the other employees. One of the female employees quit because of Weigold and the other eventually threatened to quit because of Weigold.

Weigold was also generous with discipline. While Cyplik for the most part supported her disciplinary actions, it was not unusual for Weigold to send insubordinate employees home. Cyplik urged her to try to work problems out with the employees at the store and not to pull the trigger so quickly when disciplining them.

In addition, Weigold admitted that she had a subordinate employee, Candy Kelly, cut Weigold's hair in a back room during lunchtime and that she had another employee, Maria Gagnier, balance Weigold's checkbook on occasion during the work day. When asked whether she could see a conflict of interest in having employees handle her personal business during the work day, Weigold responded, "I can see where it can be misconstrued that way, yes." JA 71.

According to Weigold, who kept a diary of significant work place events, nothing of significance occurred between September 1999 and April 2000. In December 1999, Weigold approached Sales VP Bone about the possibility of stepping down from management to sales and transferring to a store that was larger than the Fort Gratiot store (so that she could make more money) and closer to her daughters. Bone told her that there were no management positions available, but that there may be sales positions available and he would support her if she decided to do that. Bone checked back with Weigold a week later to see if she was still considering such a move. Weigold responded that she hadn't yet made a decision and that it was just something she was considering for the future.

In the first week of May 2000, Weigold took a planned vacation. Upon her return to work, she informed her supervisors that her mother was ill and that she needed time off to go to Florida to assist her. Weigold surmised that she would be back by Thursday, May 11 or Friday, May 12. Cyplik told her to "go take all the time you need." JA 81.

Between May 11 (the day Weigold first estimated she would return to work) and May 18 (the day Weigold actually returned to work), Weigold made numerous efforts to contact Cyplik and keep him informed

---

1. Weigold also testified that some of the hostilities toward her may have remained since

the time her daughter and Kerr were getting a divorce.

about when she would be able to return. Cyplik, however, was either occupied with customers or failed to return her many calls. While Weigold was gone, Robinson covered for her by working his normal off days and working without assistance on the days they normally worked together. On May 11, Weigold called and spoke to Robinson and told him that she expected to return to work on Monday, May 15. At 9:35 a.m. on May 15, Weigold called and spoke to Robinson to say that she would not be able to work that day but that she would return to the store on Thursday, May 18. Later on May 15, Weigold phoned regional manager Randy Novenske who asked, "[W]hen are you getting back so this poor man [Robinson] can have some time off?" JA 83.

On May 18, 2000, Weigold returned to work. On May 19, she disciplined two clerical employees for carrying on personal calls and not answering incoming phone calls. On May 20, Weigold asked sales associate Jeff Levitt to move a television. He refused to do so because of his bad back. When she ordered him to do so, he again refused. She told him to clock out and go home. He told her she didn't have the authority to do that. She then paged Novenske and informed him about what had happened. He told her to "swallow it this time" and diffuse the situation. JA 83. Despite this incident, Weigold testified that Levitt had been belligerent on quite a few occasions with co-workers other than herself, and that most of the time, she and Levitt got along well.

On May 25, Novenske summoned Weigold and Cyplik into a meeting. According to Weigold's affidavit, Novenske began the meeting by stating, "You sure proved to us you don't care about your job by taking this time off to be with your mother. But it was nice not having you here since no one can stand working with you anyway." JA 213. In Weigold's deposition, she testified that, when she looked to Cyplik for support because he had told her to take all the time she needed, he just shrugged. JA 159. Novenske then criticized her for not keeping them informed about when she would return to work. Weigold responded that she had called numerous times and left numerous messages for Cyplik to return her calls but that he never returned any of them. Weigold was told it was her responsibility to keep calling until she actually spoke to him. Cyplik then told her that Candy Kelly (the supervisor of the two women Weigold had disciplined the previous week) announced that she could not work with Weigold and that she was going to quit. Weigold asked if she was being fired, "and they said no." JA 159. She then stated, "Oh, yes, that's right. ABC doesn't fire anybody. You just want me to quit. . . . Well, I'll do that for you. I'll quit." Id. Novenske then said, "I'm sorry, Kathy, what did you say? I didn't hear you." Id. She responded, "Randy, you heard me very well. I said I would quit." Id. She then clocked out and left the building. Upon arriving home 45 minutes later, Weigold called Bone to tell him what had happened. She said that she had just quit and that she didn't really want to quit. Bone indicated that he knew she had quit and that he had already accepted her resignation.

One week later, Weigold had a meeting with Tony DiFalco, a member of upper management with whom she had a good relationship, to discuss the situation and try to get her job back. He told her that if she wanted to go to another store as a sales associate, since she couldn't handle management, he would be willing to transfer her. She rejected his offer, finding it unacceptable.

## II.

We review *de novo* the district court's grant of summary judgment. *See City*

*Mgt. Corp. v. U.S. Chem. Co., Inc.,* 43 F.3d 244, 250 (6ᵗʰ Cir.1994). Summary judgment is mandated if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Allen v. Mich. Dept. of Corrections,* 165 F.3d 405, 412 (6ᵗʰ Cir.1999) (citing *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted)).

## III.

### A.

 Weigold argues that the district court erred when it concluded that she failed to show any evidence of sex discrimination. Specifically, Weigold argues that she was constructively discharged based on her gender in violation of Title VII and the ELCRA.[2]

Title VII renders it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ELCRA also makes it unlawful for an employer to discriminate against an employee or prospective employee on the basis of gender. *See* M.C.L.A. § 37.2202(1)(a). Claims of discrimination brought pursuant to the ELCRA are analyzed under the same ev-

identiary framework as claims of discrimination brought under Title VII. *See Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir.1999).

Accordingly, in order to establish a *prima facie* case of sex discrimination under both statutes, the plaintiff must produce evidence sufficient to show that (1) she is a member of the protected class, (2) an adverse employment action was taken against her, (3) she was qualified for the position, and (4) she was replaced by a male or a similarly situated male was treated better. *DiCarlo v. Potter,* 358 F.3d 408, 415 (6ᵗʰ Cir.2004) (citing *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1246 (6ᵗʰ Cir.1995)). A plaintiff who establishes a *prima facie* case of discrimination receives the benefit of a presumption that the employer unlawfully discriminated against her. *Id.* at 414 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* (citing *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were a pretext for discrimination. *Id.* At all times, the plaintiff bears the ultimate burden of proving that unlawful discrimination took place. *Id.*

We find that Weigold cannot establish a *prima facie* case of discrimination because she has failed to show that ABC took any adverse employment action against her.

---

**2.** Weigold's counsel conceded at oral argument that if she failed to establish that she was constructively discharged, she could not show that she was the victim of sex discrimination.

Examples of adverse employment action include demotions, reductions in salary or job responsibilities, offers of early retirement or continued employment on terms less favorable than the employee's former status, and harassment by the employer calculated to encourage the employee's resignation. *Logan v. Denny's, Inc.,* 259 F.3d 558, 569 (6th Cir.2001) (adopting factors articulated by the Fifth Circuit in *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir.2000)). A formal reprimand may constitute adverse employment action but, absent evidence that it is "anything more than mere criticism[ ]," a verbal reprimand does not. *Mylett v. City of Corpus Christi,* 97 Fed.Appx. 473, 475 (5th Cir. 2004) (citing *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998)). *See also Nickell v. Memphis Light, Gas & Water Div.,* 76 Fed.Appx. 87, 93 (6th Cir. 2003) (holding that criticism from a supervisor, or a supervisor's request to be kept informed of communications going to an employee while on sick leave, does not constitute adverse employment action) (citing *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000); *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir.1996)) (holding that negative criticism or performance evaluation unaccompanied by a materially adverse change in the terms and conditions of employment does not constitute adverse employment action). The Sixth Circuit has reasoned, "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999).

Weigold claims that ABC took adverse employment action against her by constructively discharging her. Such claims are cognizable under Title VII. In order to demonstrate constructive discharge, a plaintiff must show that (1) the defendant deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the defendant did so with the intention of forcing the plaintiff to quit. *Logan,* 259 F.3d at 568–69 (inner quotation omitted). *See also Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 534 (10th Cir.1998) ("Essentially, a plaintiff must show that she had *'no other choice* but to quit.'") (citing *Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997), in turn quoting *Woodward v. City of Worland,* 977 F.2d 1392, 1401 (10th Cir.1992)) (emphasis in original).

To determine whether Weigold's resignation was a constructive discharge, we look to state law. *Hammon,* 165 F.3d at 447–48. Under Michigan law, "a constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Jacobson v. Parda Fed. Credit Union,* 457 Mich. 318, 328, 577 N.W.2d 881, 885 (Mich. 1998). Although the test is an objective one, *id.;* some Michigan courts have also discussed the employer's intent, "[a]n employer is held to intend the reasonably foreseeable consequences of his conduct." *Jenkins v. Amer. Red Cross,* 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (Mich. App.1985).

Weigold argues that the following statements made to her at the May 25, 2000 meeting indicated that she was being "forced" to resign: (1) Novenske's opening comment that "[y]ou sure proved to us you don't care about your job by taking this time off to be with your mother. But it was nice not having you here since no one can stand working with you anyway," JA 218; and (2) Novenske's sarcastic response after Weigold announced she was quitting, "I'm sorry, Kathy, what did you say? I didn't hear you." JA 85.

Although Novenske's comments were rude and inappropriate—particularly so

because the basis of his criticism was Weigold's exercise of her FMLA-protected rights—in and of themselves they fall short of the severe conditions necessary to suggest a constructive discharge. Had Novenske persisted in making these remarks over the course of Weigold's employment, a jury could infer that Novenske was doing everything in his power to fire her. But the fleeting nature of these comments and Weigold's hasty response preclude our conclusion that they constituted a constructive discharge.

Weigold also argues that, under Michigan law, a *prima facie* case of discrimination under the ELCRA can be established entirely upon statistical evidence showing a gender-based disparity and, because she is the only female manager or assistant manager in any of ABC's stores, she has established her *prima facie* case. Weigold cannot rest on such evidence to demonstrate her *prima facie* case, however, because she was promoted to assistant manager of the audio visual department when a male left that position, and she was promoted to assistant manager of the major appliances department over male sales associates who expressed interest in the job. If these statistics suggest anything, they negate any inference of discrimination against Weigold.

Weigold argues that Defendants–Appellees failed to articulate a legitimate business reason for the May 25 meeting which, in turn, caused her to resign. This misconstrues the applicable evidentiary framework. Weigold has the burden of establishing a *prima facie* case of discrimination before the burden of production shifts to Defendants–Appellees. Because Weigold failed to set forth her *prima facie* case, this burden never shifted.

### B.

■ Next, Weigold argues that Defendants–Appellees violated the FMLA by constructively discharging her for taking FMLA-protected leave to care for her mother. In order to establish a *prima facie* FMLA claim, the plaintiff must show that (1) she availed herself of a protected right under the FMLA, (2) she suffered an adverse employment decision, and (3) there is a causal connection between her request for leave and the adverse decision. For the same reasons that Weigold cannot establish an adverse employment action under Title VII, she cannot do so under the FMLA. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001).

### C.

■ Finally, Weigold argues that the district court erred by concluding that she was not subjected to a sexually hostile work environment. A co-worker who does not otherwise qualify as an "employer" may not be held personally liable for creating a sexually hostile work environment under Title VII. *Gwen v. Regional Transit Auth.*, 7 Fed.Appx. 496, 500 n. 3 (6th Cir. 2001) (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir.1997)). In order to establish a hostile work environment against an employer based on the actions of a co-worker, the plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to unwanted harassment, (3) the harassment was based on her membership in the protected class, (4) the harassment unreasonably interfered with her work performance, creating a hostile work environment, and (5) the defendants knew or should have known of the harassment but failed to implement prompt and appropriate corrective action. *Gwen*, 7 Fed.Appx. at 500 (citing *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997) (citations omitted)).

The test for a hostile work environment under the fourth prong has both objective

and subjective components. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir.1999). The plaintiff must show both that a reasonable person would find the environment objectively hostile, and that the plaintiff subjectively found the conduct severe or pervasive. *Id.* at 568 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Weigold cannot show that her work environment was subjectively hostile because she testified that (1) nothing of import occurred between September 1999 and April 2000, (2) she declined Bone's offer (in response to her December 1999 inquiry) to find her a position in another store closer to her daughters, and (3) after she resigned, she tried to rescind her resignation.

Weigold cannot show that her work environment was objectively hostile because the only evidence of harassment she detailed were isolated comments made by male and female co-workers who referred to her as a "bitch." However, offhand comments and isolated incidents of offensive conduct, unless extremely serious, do not constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In order to show that a work environment is objectively hostile, the alleged conduct must be so extreme that it amounts to a "change in the terms and conditions of employment." *Id.* at 788. The isolated comments about which Weigold testified do not rise to this level. Thus, she has also failed to show that her work environment was objectively hostile.

With respect to the fifth prong of the hostile environment standard, Weigold cannot show that Defendants–Appellees knew or should have known of any harassment but failed to implement prompt and appropriate corrective action. Weigold testified repeatedly that management supported most if not all of her actions in disciplining insubordinate or offensive employees. She testified that when she took other problems to management, they responded quickly and their corrective actions were effective in extinguishing offensive behavior. Indeed, the only disciplinary action taken by Weigold that was not supported by ABC was her order to Jeff Levitt to go home when he refused to move a television because of his bad back. In that case, Novenske understandably overrode her decision and told her to diffuse the situation. The Sixth Circuit has held:

> Once an employer is aware of and responds to charges of sexual harassment, ... mere negligence as to the content of the response cannot be enough to make the employer liable. When an employer responds with good-faith remedial action, we cannot say that the employer has itself committed an act of discrimination. In sum, although negligence as to the existence of harassment may be enough ... for an employer to incur liability for discrimination, negligence in the fashioning of a remedy is not. When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

*Blankenship*, 123 F.3d at 873. There is absolutely no evidence that anyone at ABC exhibited "such indifference as to indicate an attitude of permissiveness" amounting to sexual harassment. *Id.*

## V.

Accordingly, we **AFFIRM** the district court's ruling granting summary judgment in favor of Defendants–Appellees.