Shirley Ann **VERGES**, Plaintiff,

v.

**SHELBY COUNTY SHERIFF'S OFFICE**, Defendant.

No. 07–2824–JPM–egb.

United States District Court, W.D. Tennessee, Western Division.

July 8, 2010.

---

Kaye G. Burson, Rutledge & Rutledge, Memphis, TN, for Plaintiff.

Hite McLean, Jr., Law Offices of Hite McLean, Jr., Memphis, TN, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

JON PHIPPS McCALLA, Chief Judge.

Before the Court is Defendant Shelby County Sheriff's Office's ("Defendant" or "SCSO") Motion for Summary Judgment (Docket Entry ("D.E.") 44), filed January 31, 2010.[1] With leave of Court, Defendant filed its memorandum in support of its Motion for Summary Judgment (D.E. 47) on February 5, 2010. On March 30, 2010, Plaintiff Shirley Ann Verges ("Plaintiff") filed a response in opposition to Defendant's Motion for Summary Judgment (D.E. 58) and a response to Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment (D.E. 59). For the following reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

## I. Background

This case arises from Plaintiff's employment with the SCSO between January 2004 and May 2008. Plaintiff is an African–American female. She asserts claims for sex discrimination, race discrimination, hostile work environment, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. § 4–21–101 *et seq.* Plaintiff also asserts a state law claim for intentional infliction of emotional distress.

Plaintiff filed two separate complaints against Defendant, the first on December 21, 2007 (D.E. 1), and the second on February 13, 2009 (D.E. 1 in Case No. 2:09–cv–02078). On April 9, 2009, in the interest of judicial economy, this Court granted

---

1. Docket Entry 44 contains Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

Plaintiff's Renewed Motion to Consolidate because the cases involved common questions of law, the same parties, and the same counsel in both cases. (D.E. 24 at 2.) Plaintiff's complaints, however, are factually distinct, involving different forms of discrimination, different years of employment, and different employees within the SCSO. As a result, the Court will address Plaintiff's allegations as she asserted them in her separate complaints and addressed them in her response to Defendant's Motion for Summary Judgment.

### A. Allegations arising from Plaintiff's employment within the Bureau of Professional Standards and Integrity

Plaintiff began her employment with the SCSO as a deputy sheriff patrolwoman in 1979. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (D.E. 59) ¶ 1.) Plaintiff was promoted to sergeant in 1993 and was responsible for supervising and taking appropriate action against employees who violated SCSO policy. (*Id.* ¶¶ 3–5.) In December 2002, after various other assignments within the SCSO, Plaintiff was assigned to the Internal Affairs Bureau. (*Id.* ¶ 5.) In 2003, the Internal Affairs Bureau and the Disciplinary Review section were combined to create the Bureau of Professional Standards and Integrity ("BPSI"). On November 1, 2003, William Cash ("Director Cash") was named Commander of the BPSI. (*Id.* ¶ 7.) At or around this time, Lieutenant Nancy Luchessi ("Lt. Nancy Luchessi") transferred to the BPSI. (*Id.* ¶ 8.)

Plaintiff's allegations of sex discrimination, hostile work environment, and retaliation in her first complaint filed on December 21, 2007 arise from her employment within the BPSI and under the supervision of Director Cash and Lt. Nancy Luchessi. Plaintiff first alleges that Lt. Nancy Luchessi "continually harassed" her from January 2004 through May 2005. (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 6.) According to Plaintiff, Lt. Nancy Luchessi (1) yelled at her, (2) spoke to her in a "tone and manner" which Plaintiff found "degrading and humiliating," (3) assigned Plaintiff to complete a case investigation in January 2004 that had been improperly completed by a fellow officer, (4) repeatedly pressured Plaintiff about finishing her workload, and (5) would tell Plaintiff that she was "running out of time," which Plaintiff interpreted as threatening and intimidating. (*Id.* at 6; *see also* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 46.) According to Plaintiff, Lt. Nancy Luchessi "was on [her] every chance she got," thereby creating a hostile work environment. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 45.)

On February 20, 2004, Plaintiff sent Director Cash a memorandum requesting reassignment to the criminal courts. (*Id.* ¶ 9; Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 24 of 27.) On March 3, 2004, Plaintiff received a memorandum from Director Cash stating that her responsibilities were being modified in light of her transfer request. (Exhibits in Supp. of Def.'s Mot. Summ. J. at p. 27 of 27.) The memorandum stated that Plaintiff would "no longer be responsible for the investigation of active cases." (*Id.*) Plaintiff, instead, was required to handle (1) walk-in complaints, (2) background investigations, (3) maintain information files, and (3) collect all SCSO property from employees leaving SCSO employment. (*Id.*) According to Director Cash, the modification of Plaintiff's duties was intended to "allow for a smooth transition for both [Plaintiff] and for the division" after Plaintiff's reassignment. (*Id.*) Director Cash invited Plaintiff to speak with him if she had any questions regarding the memorandum. (*Id.*)

SCSO transfer requests such as Plaintiff's required approval by the division supervisor relinquishing the transferring employee and the division supervisor receiving the transferring employee. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 14; Verges Dep. 154:9–16, May 18, 2009.) In addition to informing Director Cash about her interest in transferring, Plaintiff met with other superior officers including Chief Benson, Chief Young, and Chief Oldham. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 19.) All three chiefs denied Plaintiff's transfer request, stating that the criminal courts to which Plaintiff desired to transfer did not need additional sergeants. (Id.; Verges Dep. 152:5–25; 153:1–14.)

Beginning in May 2004 and continuing until October 2005, Plaintiff contends that Director Cash subjected her to unwanted and unwelcomed sexual advances. (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 6.) According to Plaintiff, the sexual harassment began when she returned to work after lap band surgery, a weight loss procedure, in May 2004. (Id.) Plaintiff contends that Director Cash (1) told co-workers that Plaintiff pursued him during their years at the academy in the 1970's, (2) told co-workers that Plaintiff wanted to date him and would come to his house and call him, (3) stared at Plaintiff in a sexual manner on several occasions, (4) asked Plaintiff to dance for him in his office on one occasion in August 2005, (5) asked her if she was dating, (6) offered to buy Plaintiff's daughter a car if transferring to a remote location would be a hardship, and (7) told Plaintiff that he would take care of her, if she took care of him, which Plaintiff interpreted as a sexual *quid pro quo*. (Id. at 14–15.)

Plaintiff did not report Director Cash's alleged sexual harassment to anyone at the SCSO prior to filing an Equal Employ-

ment Opportunity Commission ("EEOC") charge on June 5, 2006. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 24.) Plaintiff states that she did inform her daughter and a clinical psychologist employed with the Shelby County government while the alleged harassment was ongoing. (Id.) Plaintiff contends that she feared retaliation from Director Cash and Lt. Nancy Luchessi if she reported the sexual harassment. (Id. ¶ 26.) In support of her fear, Plaintiff states that in December 2005 Sametta Jones–Tennial filed a hostile work environment sexual harassment complaint. (Id. at ¶¶ 28, 29.) After the SCSO initiated an internal investigation, there was insufficient evidence to support Ms. Tennial's allegations. (Id. at ¶ 28.) On July 28, 2009, while still employed at the SCSO, Ms. Tennial was indicted for theft of over $1,000 and official misconduct. (Id. ¶ 30; Def.'s Mot. Summ. J. (D.E. 49–2) at p. 6 of 23.) Ms. Tennial was discharged on August 7, 2009. (Id.)

During the time of the alleged sexual harassment from May 2004 to October 2005, the Shelby County government had a written antiharassment policy, prohibiting "any form of discrimination, including harassment based on sex, race, color, religion, national origin, age, gender, disability or other status protected by law." (Id. ¶ 103; Def.'s Mot. Summ. J. (D.E. 49) at p. 2 of 27.) The antiharassment policy established five basic complaint procedures, any one of which an employee could utilize to assert a harassment complaint. (Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 6 of 27.) The five reporting options included (1) promptly notifying the offender that his or her conduct is unwelcome, (2) promptly notifying a management representative within the employee's work unit, (3) notifying the Shelby County Human Resources Administrator, (4) notifying the Shelby County Equal Opportunity Compliance Office, and/or (5) utilizing any

other notification mechanism available under state or federal law. (*Id.* at p. 7 of 27.)

Plaintiff admits that she was familiar with the antiharassment policy; she received training on the policy on multiple occasions; she completed all-day training on the sexual harassment policy in 2005; as a management representative, she was required to notify the Shelby County Human Resources Administrator whenever she received a harassment complaint; and as an investigator, she investigated a small number of sexual harassment complaints. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 103–109; Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 12 of 27.)

Plaintiff was ultimately transferred from the BPSI to the Detective Division on November 26, 2005. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 20.) Plaintiff filed her first EEOC charge on June 5, 2006, alleging sex discrimination, hostile work environment based on sexual harassment, and retaliation based on her time at BPSI. Shortly after receiving notice of Plaintiff's EEOC charge, an internal investigation was conducted from the end of June to early July 2006. (*Id.* ¶ 50.) Dini Malone, the Director of Administrative Services for the Juvenile Court of Memphis and Shelby County and the person investigating Plaintiff's allegations, concluded that there was no factual basis to support Plaintiff's charge. (*Id.* ¶ 55.) Plaintiff contends that Ms. Malone's conclusion was incorrect. (*Id.*)

As a result of the alleged discrimination and harassment while under the supervision of Director Cash and Lt. Nancy Luchessi, Plaintiff claims that she suffered adverse employment actions. First, Plaintiff claims that Director Cash intentionally blocked her transfer request. (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 16.) She states that she spoke with Director Cash numerous times up to November 2005 about transfer opportunities, but nothing materialized. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 56.) Plaintiff contends that in January 2005, Director Cash stated she would be able to transfer when he filled two investigator positions, but after the positions were filled she was not transferred. (*Id.*)

Second, Plaintiff contends that after her job responsibilities were modified in March 2004, she received additional clerical assignments, such as answering telephone calls, that made her work "overwhelming and unpredictable." (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 16; Verges Aff. (D.E. 69) ¶ 9.)

Third, Plaintiff states that she was the victim of retaliation and refers the Court to an incident involving a poor performance evaluation on February 28, 2006. (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 16, 20.) According to Plaintiff, Lt. John Mills of the Detective Division gave her a good April 1, 2005 to March 31, 2006 evaluation, but Director Cash and Lt. Luchessi redid the form, adding negative comments and low scores. (*Id.* at 20.) Plaintiff admits that the negative performance evaluation did not affect her employment in any way; she did not suffer a loss of pay nor was she denied a promotion that she was seeking. (Verges Dep. 225:3–19; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 93.) Plaintiff contends, however, that "[the negative performance evaluation] could have effected" her future employment. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 93.)

**B. Allegations arising from Plaintiff's employment within the General Investigation Bureau ("GIB" or "Detective Division")**

Plaintiff's second complaint, (D.E. 1 in Case No. 2:09–cv–02078), filed February

13, 2009, alleges claims of race discrimination, hostile work environment, and retaliation pursuant to Title VII and the THRA, along with a state law claim for intentional infliction of emotional distress. The allegations in Plaintiff's 2009 complaint pertain to her employment period within the GIB and are factually distinct from Plaintiff's allegations while employed within the BPSI.

On January 5, 2007 Plaintiff states that Detective George Morton, a Caucasian male, "verbally attacked her creating a hostile work environment." (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 8.) From the record, it appears that the content of the altercation involved the assignment of cases within the department. (Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49–1) at p. 5 of 27, ("Pl.'s Incident Report Involving Detective Morton").) Plaintiff admits that Detective Morton did not use any racial references or slurs during the verbal altercation. (Verges Dep. 41:23–25; 42:1–4.) Plaintiff, however, contends that Detective Morton's attack was "venomous and racially motivated," (id. 40:22–25), based on "his tone" (id. 41:10).

To support her inference, Plaintiff states that while working at GIB, she overheard Detective Morton make a reference to "watermelons and blacks" and once heard him tell a "black female employee and part-time real estate agent, that if she had been white, a house she was selling would have sold quicker." (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 60–61.) Plaintiff does not state when and in what context she overheard these two comments. On January 8, 2007 Plaintiff formally reported her verbal altercation with Detective Morton to Lt. Wright. (Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49–1) at p. 5 of 27.) Plaintiff's complaint criticizes Detective Morton's behavior, but does not state that the verbal altercation regarding case assignments

was racially motivated. (See id. at p. 5–8 of 27.)

On February 12, 2007, Plaintiff filed an amended charge with the EEOC stating that she had been discriminated against because of her race, age, and disability when she was singled out and given more responsibilities than other employees in the BPSI. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 57.) Plaintiff's amended EEOC charge did not include the incident with Detective Morton. (Id. ¶¶ 57, 58.)

On July 30, 2007, Captain Cobb, an African–American male and one of Plaintiff's superior officers, forwarded an email to all detectives working under his supervision, including Plaintiff. (Id. ¶¶ 85, 86; Def.'s Mot. Summ. J. 22.) The email was titled "These Trees Bear Strange Fruit" and contained a link to the website "abolishthenword.com." (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 85.) The website contained graphic black and white images of African–American lynchings and stated that the perpetrators of these acts used the "N" word; the website called for the end of the use of the "N" word. (Id.) Plaintiff contends that the email was racially motivated and highly offensive. (Verges Aff. ¶ 25.) Plaintiff delivered the images to Janet Buhr, an SCSO Human Resource representative, for the first time on August 21, 2007. (Janet Buhr's Unsworn Statement Under Penalty of Perjury ("Buhr's Statement") (D.E. 47–1) ¶¶ 8–9.)

On August 10, 2007, Lt. Mills and Sgt. Sides reported Plaintiff for leaving her assigned vehicle unlocked in violation of SCSO policy, which Plaintiff denies. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 75.) Regardless of whether this incident occurred, Captain Cobb instructed Lt. Mills and Sgt. Sides to leave the matter alone as long as nothing

was missing from the vehicle. (*Id.* ¶ 76.) Following Captain Cobb's instructions, Plaintiff was not disciplined nor did she receive any further communication regarding the alleged policy violation. (*Id.* ¶ 77.) Plaintiff believes that Lt. Mills and Sgt. Sides reported the vehicle violation in retaliation for the filing of her EEOC complaint against Director Cash in June 2006. (*Id.* ¶ 78.)

On August 21, 2007, Plaintiff was notified by Janet Buhr that she was relieved of duty and was required to undergo a psychological evaluation because co-workers within the GIB reported that they were afraid to work with her, claiming that they "felt they ha[d] to walk on eggshells around [her]." (*Id.* ¶ 81.) Plaintiff was on paid administrative leave for approximately two months while she underwent a psychological evaluation. (*Id.* ¶ 84.) During the August 21 meeting, Plaintiff presented Captain Cobb's July 30 email and stated that she found the photographs offensive. (Buhr's Statement ¶ 9.) Plaintiff did not state that she wanted to file an internal complaint against Captain Cobb for sending the email. (*Id.*) Without specifying, Plaintiff contends that she was relieved of duty for filing "earlier complaints against a subordinate and Administrative personnel." (*Id.* ¶ 83; Exhibits in Support of Def.'s Mot. Summ. J. at p. 12 of 27.) On November 5, 2007, after Plaintiff had returned to work, she filed a second EEOC charge alleging retaliation and discrimination based on race and sex. (*Id.*)

Plaintiff voluntarily retired on May 1, 2008. (*Id.* ¶ 97.) She contends that she intended to retire after thirty years of service, but due to the hostile work environment, she retired after twenty-nine years. (*Id.* ¶ 98.) During her contested work period from January 2004 to May 2008, Plaintiff admits that she never sought a promotion that was denied to her, was never suspended without pay, and

never suffered a loss of pay. (*Id.* ¶¶ 31–33.)

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 250 (6th Cir.1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "wheth-

er the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## III. Analysis

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Pursuant to Title VII, Plaintiff has asserted claims for (1) hostile work environment based on sex, (2) age and disability discrimination, (3) race discrimination, (4) hostile work environment based on race, and (5) retaliation. Each of Plaintiff's claims is addressed in turn by the Court.

### a. Hostile Work Environment Based on Sex

Sexual harassment violates Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To establish a prima facie case of hostile work environment based on sex, a plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable. *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 347 (6th Cir.2005).

Defendant first contends that Plaintiff's sexual allegations do not, as a matter of law, rise to the level of a hostile work environment. Second, Defendant contends

that even if Plaintiff establishes the first four elements of her prima facie hostile work environment claim, she cannot establish employer liability. Finding that Plaintiff failed to establish employer liability, the Court does not reach Defendant's additional ground for summary judgment. The Court therefore assumes for the purpose of the employer liability analysis only that Plaintiff's allegations are sufficient to establish a hostile work environment based on sex.

### i. *Employer Liability*

An employer's liability for supervisory sexual harassment depends on the consequences of the supervisor's action. *Keeton v. Flying J, Inc.,* 429 F.3d 259, 262 (6th Cir.2005). If proven sexual harassment by the supervisor *did not* result in a tangible employment action, the employer may assert an affirmative defense to liability, subject to proof by a preponderance of evidence, that (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provided. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (both establishing the "Faragher–Ellerth affirmative defense"). If the sexual harassment did result in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment. *Ellerth,* 524 U.S. at 762–63, 118 S.Ct. 2257.

### 1. *Tangible Employment Action*

Relying on agency principles, the *Ellerth* Court reasoned that when a supervisor makes a tangible employment decision, there is assurance that the victim's injury could not have been inflicted absent

the agency relationship between the supervisor and the employer. *Id.* at 761–62, 118 S.Ct. 2257. The *Ellerth* Court defined a tangible employment action as "a sufficient change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. 2257. Accordingly, the Sixth Circuit has stated that an employment action must be materially adverse for an employer to be strictly liable for sexual harassment. *Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir.1996).[2] Although an adverse employment action need not rise to the level of an ultimate employment decision to be actionable, the employer's conduct must create a "serious and material" change to the terms, conditions, or privileges of the employee's employment. *Sands v. Jackson State Cmty. Coll.*, No. 1–03–1333–T–An., 2006 WL 1174469, at *5 (W.D.Tenn. April 29, 2006).

■ First, the Court must identify Plaintiff's alleged incidents that are probative of a hostile work environment claim based on sex before evaluating whether Plaintiff suffered a resulting tangible employment action. Plaintiff asserts that Lt. Nancy Luchessi "continually harassed" her from January 2004 through May 2005, citing incidents involving Lt. Nancy Luchessi's tone and manner, case assignment decisions, and work deadline pressure.[3] (*See* Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 6.) Although non-sexual conduct, such as the incidents alleged by Plaintiff, may be illegally sex-based, the plaintiff "must show that but for the fact of her sex, she would not have been the object of harassment." *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir.1999). While Plaintiff lists acts of alleged harassment from Lt. Nancy Luchessi, there is no evidence that these non-sexual acts were motivated by a discriminatory animus against women or directed at Plaintiff because she is female. Moreover, Plaintiff offers no evidence that Lt. Nancy Luchessi's actions were in any way related to Director Cash's unwelcomed sexual advances. As a result, the Court only evaluates whether Plaintiff suffered a tangible employment action as a result of Director Cash's alleged sexual harassment from May 2004 to October 2005.

Plaintiff contends that she suffered three tangible employment actions as a result of her refusal to submit to Director Cash's alleged sexual harassment: (1) Director Cash intentionally blocked her transfer request, (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 16), (2) her job responsibilities were modified after March 2004, requiring her to handle more clerical work than she was capable of completing, (id.; Verges Aff. ¶ 9), and (3) Director Cash gave her a poor performance evaluation on February 28, 2006 (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 16, 20). The Court addresses each action in turn.

First, it is undisputed that SCSO transfer requests such as Plaintiff's required

---

**2.** For the purposes of the anti-discrimination provision of Title VII, the terms "tangible employment action" and "adverse employment action" are interchangeable. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 n. 5 (6th Cir.2000); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**3.** Specifically, Plaintiff contends that Lt. Nancy Luchessi (1) yelled at her, (2) spoke to her in a "tone and manner" which Plaintiff found "degrading and humiliating," (3) assigned Plaintiff to complete a case investigation in January 2004 that had been improperly completed by a fellow officer, (4) repeatedly pressured Plaintiff about finishing her workload, and (5) would tell Plaintiff that she was "running out of time," which Plaintiff interpreted as threatening and intimidating. (Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 6.)

approval by both the division supervisor relinquishing the employee and the division supervisor receiving the employee. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 14; Verges Dep. 154:9–16.) Plaintiff voluntarily requested a transfer to criminal courts on February 20, 2004, three months prior to the commencement of the alleged sexual harassment. (Id. ¶ 9; Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 6.)

There is no evidence that Director Cash denied Plaintiff a transfer that had been approved by another division supervisor. There is no evidence that Director Cash gave Plaintiff a negative evaluation to prevent her transfer. To the contrary, the record shows that Director Cash informed Chief Oldham of Plaintiff's desire to transfer and stated that "she ha[d] done an exemplary job" with her responsibilities in his unit. (Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 26 of 27.) Additionally, the fact that BPSI received two investigators yet Plaintiff was still unable to transfer does not support an inference that Director Cash intentionally blocked her transfer. There is no evidence that these two investigators came from the criminal courts where Plaintiff desired to transfer. Nor is there any evidence that the investigators' outgoing department(s) requested, desired, or would have permitted an employee transfer in exchange for the outgoing investigators.

Moreover, Plaintiff admits that she spoke independently with Chief Benson, Chief Young, and Chief Oldham. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 19.) All three chiefs denied her transfer request, stating that the criminal courts did not need additional sergeants. (Id.; Verges Dep. 152:5–25; 153:1–14.) Based on these facts, no reasonable juror could infer that Director Cash prevented Plaintiff's transfer, which she ultimately received on November 26, 2005.

Plaintiff's next two assertions involve the March 3, 2004 modification to Plaintiff's work duties and the February 28, 2005 poor performance evaluation. Plaintiff does not challenge the fact that her work duties were modified on March 3, 2004 to include more clerical tasks in light of her transfer request submitted on February 20, 2004. (Verges Aff. ¶ 9; Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 27 of 27.) Plaintiff simply contends that she received additional clerical duties following the modification such as "answering telephone calls" that made her workload "overwhelming and unpredictable." (Verges Aff. ¶¶ 9–10.) Plaintiff, however, offers no evidence that as a result of her increased workload she suffered a "serious and material" change to the terms, conditions, or privileges of her employment such as a termination, demotion, pay reduction, or increased hours. Instead, the record shows that when Plaintiff complained about the stress of her additional work, Director Cash and Lt. Nancy Luchessi permitted Plaintiff to relinquish some of her duties to a fellow employee. (See Verges Dep. 346:12–25; 347:1–17.)

Turning to the February 28, 2006 evaluation, Plaintiff admits that Director Cash's negative comments did not adversely affect her employment. (Verges Dep. 225:3–19; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 93.) Plaintiff argues that the "[negative performance evaluation] *could* have effected [sic]" her future employment. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 93 (emphasis added).) A negative performance evaluation unaccompanied by a materially adverse change in employment terms, however, does not constitute an adverse employment action. *See Weigold v. ABC Appliance Co.*, 105 Fed.Appx. 702,

708 (6th Cir.2004) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir.1996) (holding that negative criticism or performance evaluation unaccompanied by a materially adverse change in the terms and conditions of employment does not constitute adverse employment action)). The Sixth Circuit has reasoned that "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999).

For these reasons, the Court finds that Plaintiff did not suffer a tangible employment action as a result of Director Cash's alleged sexual harassment.

### 2. *Faragher–Ellerth Affirmative Defense*

Provided that a harassing supervisor's actions did not result in a tangible employment action, an employer can avoid liability by establishing that (1) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provided. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. The existence of an effective antiharassment policy with complaint procedures can be appropriately considered as evidence satisfying the first element of the affirmative defense. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. Additionally, proof that an employee failed to utilize any of the corresponding antiharassment complaint procedures "will normally suffice to satisfy the employer's burden under the second element of the defense." *See id.*

■ During the time of the alleged sexual harassment from May 2004 to October 2005, it is undisputed that the Shelby County government had a written antiharassment policy in place, which established five basic complaint procedures. (Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 6 of 27; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 103.) There are no facts suggesting that Defendant's antiharassment policy was ineffective. Moreover, Plaintiff admits that she was familiar with the harassment policy; she received training on the policy on multiple occasions; she completed all-day training on the sexual harassment policy in 2005; as a management representative, she was required to notify the Shelby County Human Resources Administrator whenever she received a harassment complaint; and as an investigator, she investigated a small number of sexual harassment complaints. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 103–109; Exhibits in Supp. of Def.'s Mot. Summ. J. (D.E. 49) at p. 12 of 27.)

Despite Plaintiff's familiarity with Defendant's antiharassment policy and reporting procedures, Plaintiff admits that she did not report her sexual harassment allegations to anyone at the SCSO until June 5, 2006, when she filed her first EEOC charge. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 24.) Plaintiff has not asserted that her disclosure of the alleged harassment to her daughter or her clinical psychologist employed by the Shelby County government prior to the filing of her EEOC charge constitutes one of the listed reporting methods in Defendant's antiharassment policy.

■ Plaintiff contends that she did not report the alleged sexual harassment because she feared retaliation from Director Cash and Lt. Nancy Luchessi. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 26.) A "generalized fear of retaliation" unaccompanied by any "objective evidence to substantiate that fear,"

however, is, as a matter of law, insufficient to justify an employee's failure to comply with a reporting policy. *Howard v. City of Robertsdale,* 168 Fed.Appx. 883, 888 (11th Cir.2006). Plaintiff's attempt to justify her fear by referring to Sametta Jones–Tennial, a former SCSO employee who filed a sexual harassment complaint in December 2005, is without merit. (*See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 28, 28.)

First, Plaintiff claims that her alleged sexual harassment began in May 2004, which is seven months prior to Ms. Tennial's complaint. Second, there is no evidence that Ms. Tennial suffered any adverse action based on her complaint; she remained employed at the SCSO until August 7, 2009, when she was discharged after being indicted for theft of over $1,000 and official misconduct. (*Id.* ¶ 30.) Based on these facts, it is not possible that Ms. Tennial's experience could have justified Plaintiff's alleged fear of retaliation and failure to utilize Defendant's harassment reporting methods.

Shortly after receiving notice of Plaintiff's June 5, 2006 EEOC charge, the SCSO initiated an internal investigation from the end of June to early July 2006. (*Id.* ¶ 50.) "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Collette v. Stein–Mart, Inc.,* 126 Fed.Appx. 678, 686 (6th Cir.2005). By doing so, "the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace." *Id.* By the time Defendant had become aware of Plaintiff's allegations, she had already been transferred out of Director Cash's supervision and an internal investi-

gator had interviewed all parties allegedly involved. Plaintiff does not dispute the rigor of Defendant's internal investigation, merely its conclusion that there was no factual basis supporting Plaintiff's allegations.

For these reasons, the Court finds that Defendant has established that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that Defendant provided. Defendant's Motion for Summary Judgment is GRANTED as it relates to Plaintiff's claim of a hostile work environment based on sex.[4]

### b. Age and Disability Discrimination

Plaintiff's June 6, 2007 EEOC charge, attached as Exhibit 1 to Plaintiff's December 21, 2007 complaint (D.E. 1), includes allegations of age and disability discrimination. Plaintiff, however, did not assert any facts supporting these allegations in either her December 21, 2007 complaint or her February 13, 2009 complaint. Additionally, Plaintiff's response in opposition to Defendant's motion for summary judgment does not address these claims. To the extent it can be construed that Plaintiff has asserted claims of age and disability discrimination, the Court GRANTS Defendant's Motion for Summary Judgment on these grounds.

### c. Race Discrimination

After Plaintiff was transferred to GIB in November 2005, she claims she suffered discrimination based on race. To establish a prima facie case of race discrimination, a plaintiff must show that (1) she is a member of a protected group, (2) she was sub-

---

4. The Court does not analyze Plaintiff's sex discrimination claim separately because there is no evidence that it involves factual allega-

tions distinct from her hostile work environment claim based on sex.

ject to an adverse employment action, (3) she was qualified for the position, and (4) similarly-situated non-protected employees were treated more favorably. *See Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997), *reh'g and reh'g en banc denied.*[5] Plaintiff has put forth no evidence from which the jury could conclude that similarly-situated non-protected employees were treated more favorably. (*See* Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 17–18 (merely listing incidents which allegedly had racial overtones, but not citing any evidence that similarly-situated non-protected employees were treated differently).)

### d. Racially Hostile Work Environment

"To establish a prima facie case of a racially hostile work environment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 515 (6th Cir.2009) (*citing Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999)). Defendant contends that Plaintiff cannot establish the fourth prong of her prima facie case because she cannot show that the alleged harassment was severe or pervasive enough to create a hostile work environment.

In the Sixth Circuit, an employee is not required to show that the alleged harassment was both subjectively and objectively severe and pervasive. *Gallagher v. C.H. Robinson Worldwide, Inc.,* 567 F.3d 263, 274 (6th Cir.2009) (*citing Williams v. Gen. Motors Corp.,* 187 F.3d 553, 566 (6th Cir. 1999)).[6] Rather, she need only show that "the [work] environment is objectively hostile and the harassment is subjectively severe and pervasive." *Id.; see also Williams,* 187 F.3d at 568 ("[t]he focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.' ").

Whether Plaintiff subjectively viewed the alleged racial harassment as severe and pervasive "is quintessentially a question of fact." *See Jordan v. City of Cleveland,* 464 F.3d 584, 597 (6th Cir.2006) (citation and internal quotation marks omitted). The Court, therefore, declines to evaluate the severity and pervasiveness of the alleged harassment at the summary judgment stage. The question before the Court is whether a fact issue exists as to whether a reasonable person could have found the work environment to be objectively hostile. The Court finds that such a fact issue does not exist.

When determining whether a reasonable person would find a work environment objectively hostile, the Court "must take into account the totality of the circumstances." *Gallagher,* 567 F.3d at 273 (citation omitted). The Court must look at "the frequency of the discriminatory conduct; its severity; whether it is

---

**5.** The Court notes that Title VII race discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. Because Plaintiff has failed to establish her prima facie case of race discrimination, the Court does not discuss the *McDonnell Douglas* framework.

**6.** Although *Gallagher* involved a hostile work environment claim in the gender-discrimination context, the Sixth Circuit has held that race and gender-based discrimination claims are reviewed under similar standards. *Armstrong v. Whirlpool Corp.,* 363 Fed.Appx. 317, 328–29 (6th Cir.2010) (*citing Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir.1999)).

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. "[E]ven where individual instances of [racial] harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Gallagher,* 567 F.3d at 273 (citation omitted) (alteration in original).

In support of her racially hostile work environment claim, Plaintiff proffers the following evidence: (1) the verbal altercation with Detective Morton, a Caucasian male, on January 5, 2007, (Verges Dep. 41:23–25; 42:1–4); (2) Detective Morton's alleged comments involving "watermelons and blacks" and his telling an African–American real estate agent she would have sold a house quicker if she were white, (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 60, 61); and (3) the email she received from Captain Cobb, an African–American male, with a link to the website "abolishthenword.com," (*id.* ¶ 85; Verges Aff. ¶ 25).

■ Taken together, however, the Court finds that the alleged incidents do not rise to the level of an actionable hostile work environment. Plaintiff does not provide any details regarding when, over the course of her twenty-nine year career at the SCSO, she overheard Detective Morton's alleged comments, nor does she provide any details regarding the context in which she overheard the alleged comments.[7] Furthermore, Plaintiff admits that her direct verbal altercation with Detective Morton on January 5, 2007 did not include any racial remarks. (Verges Dep. 41:23–25; 42:1–4.) Plaintiff's assertion,

eleven months later in her November 5, 2007 EEOC charge, that Detective Morton's comments were "venomous and racially motivated" based solely on "his tone" is insufficient to establish that his conduct was racially discriminatory. Finally, although Plaintiff may have found Captain Cobb's single email offensive, there is no evidence that it was intended to be racially discriminatory, insulting, or humiliating.

The Court therefore finds that no fact issue exists as to whether a reasonable person would find Plaintiff's work environment objectively hostile. Defendant's Motion for Summary Judgment is GRANTED as it relates to Plaintiff's claim of a racially hostile work environment.

### e. Retaliation

"Title VII forbids an employer from 'discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] [the so-called 'opposition clause'], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] [the so-called 'participation clause'].'" *Niswander v. The Cincinnati Ins. Co.,* 529 F.3d 714, 719–20 (6th Cir. 2008) (*citing* 42 U.S.C. § 2000e–3(a)) (alterations in original). Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." *Id.* (*citing* 42 U.S.C. § 2000e–2).

In the absence of direct evidence of retaliation, courts analyze Title VII retalia-

---

7. Although racially derogatory comments need not be directed at Plaintiff to constitute conduct violating Title VII, the fact that the comment was not directed at Plaintiff "contributes to [the] conclusion that the conduct

here was not severe enough." *Ladd v. Grand Trunk W. R.R., Inc.,* 552 F.3d 495, 501 (6th Cir.2009) (*quoting Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.1997)).

tion claims at the summary judgment stage using the *McDonnell Douglas* burden-shifting framework. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir.2008). Under this framework, the plaintiff has the initial burden to establish a prima facie case of retaliation by showing: (1) she engaged in a protected activity; (2) the defendant knew she engaged in the protected activity; (3) the defendant subsequently took an adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action. *Id.*

Once the plaintiff presents sufficient evidence to establish her prima facie case, the burden then shifts to the employer to "produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* The plaintiff must then show that the defendant's proffered reason for the adverse action was a pretext for intentional retaliation. *Id.*

### (i) Prima facie case

In the instant case, Defendant does not dispute that Plaintiff engaged in protected activity when she complained about the perceived sexually and racially hostile work environment and various forms of discrimination to the EEOC and the SCSO. *See Niswander,* 529 F.3d at 721 ("The opposition clause . . . covers conduct such as 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.'" (citation omitted)). Likewise, Defendant does not dispute that it had knowledge that Plaintiff engaged in the protected activity. Defendant contends that Plaintiff fails to establish a prima facie case of retaliation because she did not suffer an adverse action.

### (1) Adverse action

The standard for whether an act of retaliation rises to the level of material adversity is an objective one, based on whether the act would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citation and internal quotation marks omitted). This more liberal definition permits actions not materially adverse for purposes of an antidiscrimination Title VII claim to qualify as such in the retaliation context. *See, e.g., id.* at 62–63, 126 S.Ct. 2405.[8]

Plaintiff asserts that the following conduct constitutes "adverse employment action": (1) Director Cash's poor performance review on February 28, 2006; (2) poor performance scores on her April 1, 2006 to June 30, 2007 evaluation; (3) the verbal altercation between Plaintiff and Detective Morton on January 5, 2007; (4) the August 10, 2007 report that Plaintiff left her vehicle unlocked with the windows down; and (5) the placement of Plaintiff on paid administrative leave from approximately August 2007 to November 2007 for psychological evaluation. (*See* Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. 21–22.)[9]

**8.** The *Burlington Northern* Court noted that there is a material difference in the term "adverse action" depending on whether the alleged acts relate to Title VII's core antidiscrimination provision or its antiretaliation provision. *Id.* at 61–62, 126 S.Ct. 2405. The Court found that the language in the antidiscrimination provision "limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace." *Id.* at 62, 126 S.Ct. 2405. No such limiting words appear in the antiretaliation provision, *id.,* indicating Congress's intent to prohibit a wider variety of "employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC, the courts, and their employers,'" *id.* at 68, 126 S.Ct. 2405.

**9.** Plaintiff also asserts that she was assigned seven different cars in an eight month period in GIB. (*See* Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. at 21.) The Court, however, does

The Court addresses the alleged adverse actions individually because they are temporally distinct and involve different actors and diverse conduct that does not establish any discernable pattern of discrimination or retaliation.

First, the Court does not consider Plaintiff's poor performance review from Director Cash on February 28, 2006 as an adverse retaliatory action because Plaintiff admits that she did not report the alleged sexual harassment to anyone at the SCSO prior to June 5, 2006. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 24.) As a result, it is factually impossible for Plaintiff to establish the necessary causal connection between the protected activity and the adverse action.

Next, Plaintiff does not assert any evidence that she suffered a material adverse consequence because of her contested performance evaluation during the April 1, 2006 through June 30, 2007 review period. In the contested evaluation, Plaintiff's performance was reviewed in twenty-five different categories, in only three of which Plaintiff received a disputed low score. (Exhibits in Supp. of Def.'s Mot. Summ. J. at p. 21–24 of 27 (citing three instances where Plaintiff received a "2 out of 5").) These three scores were increased a week after Plaintiff filed a grievance on November 20, 2007. (*Id.* at p. 14 of 27.) Plaintiff admits that these three negative scores did not affect her employment in any way. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 24.) Furthermore, Plaintiff offers no evidence that she was receiving significantly better performance evaluations prior to her reports of discrimination beginning in June 2006.

Based on these facts, the Court finds that three low scores within a broader performance review that are not part of an identifiable pattern of retaliation and do not culminate in a tangible employment action, are not conduct which could reasonably dissuades an employee from making or supporting a charge of discrimination. *See Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405 ("Adverse actions taken in retaliation must be 'material' because it 'is important to separate significant from trivial harms.'"); *but cf. Halfacre v. Home Depot, U.S.A., Inc.,* 221 Fed.Appx. 424, 432 (6th Cir.2007) (finding a material issue of fact whether a low performance evaluation was considered an adverse action where there was evidence that employee's prior evaluations before engaging in protected activity were generally "stellar.")

The Court now considers the verbal altercation between Plaintiff and Detective Morton, a lower-ranked officer, on January 5, 2007. There is no evidence that Plaintiff suffered any negative consequence for reporting Detective Morton's behavior, which she found offensive and threatening. There is no evidence that Detective Morton was aware of Plaintiff's earlier EEOC charge. Plaintiff's attempt to establish a causal connection between the June 5, 2006 EEOC charge and the verbal altercation with Detective Morton seven months later is too remote to support an inference of causation. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007) (noting that to establish a causal connection between the protected activity and the adverse action, a plaintiff must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action."); *see also Parnell v. West,* No. 95–2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997) (noting that causal connections established on the proximity of

---

not consider this conduct because there is no evidence in the record supporting the allegation apart from the one sentence in Plaintiff's brief. *See Nix v. O'Malley,* 160 F.3d 343, 347

(6th Cir.1998) (unsworn allegations in a brief are insufficient to create a factual dispute on a motion for summary judgment).

time alone have involved short periods of time usually less than six months).[10]

The Court also finds Plaintiff's reference to an August 10, 2007 report that she left her vehicle unlocked in violation of SCSO policy insufficient to establish an adverse action. Plaintiff did not suffer any negative consequence as a result of the purported conduct. Plaintiff admits that Captain Cobb instructed Lieutenant Mills and Sergeant Sides, the officers who allegedly reported the incident, to leave the matter alone as long as nothing was missing from the vehicle. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 76.) Following Captain Cobb's instructions, Plaintiff admits that she was not disciplined nor did she receive any further communication regarding the alleged incident. (*Id.* ¶ 77.)

Next, Plaintiff contends that she suffered an adverse action when she was placed on two-month, paid administrative leave. In *Peltier v. United States,* 388 F.3d 984, 988 (6th Cir.2004), the court in a Title VII case considered whether a federal employee suffered an adverse employment action when she was placed on paid administrative leave pending the resolution of an internal investigation. The court concluded plaintiff's paid administrative leave was not an adverse employment action because she was placed on leave pending the outcome of an investigation into suspected wrongdoing and was returned to her position upon conclusion of the investigation. *Id.* at 988; *see also Breaux v. City of Garland,* 205 F.3d 150, 152 (5th Cir. 2000) (finding that plaintiff did not suffer an adverse employment action when he was subjected to an internal investigation, polygraph tests, a psychological evaluation, and was placed on administrative leave following the exercise of protected activity).

In this case, Plaintiff was notified by Janet Buhr, an SCSO Human Resource representative, that she was relieved of duty and required to undergo a psychological evaluation based on concerns cited by co-workers. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 81.) Plaintiff has failed to produce evidence, nor has the Court found evidence in the record, indicating that these "concerns" were voiced by Captain Cobb, Director Cash, Lt. Nancy Luchessi, Detective Morton, Lt. Mills, or Sgt. Sides—the employees Plaintiff cites for discriminatory acts prior to August 21, 2007. (*See* Def.'s Statement of Undisputed Material Facts (D.E. 44–1) ¶ 81 (noting only that "co-workers" within the Detective Division stated that they were afraid to work with Plaintiff); Buhr Statement (D.E. 47–1) ¶¶ 8–9; Exhibits in Supp. of Def.'s Mot. Summ. J at p. 11–12 of 27.)

Immediately following her meeting with Janet Buhr on August 21, 2007, Plaintiff was placed on paid administrative leave. (*Id.* ¶ 84.) After successfully passing her psychological evaluation, Plaintiff returned to work and her pre-administrative leave position. There is no evidence that Plaintiff suffered a loss of benefits or a salary reduction either during or after her administrative leave. There is no evidence that Plaintiff's psychological evaluation took longer than reasonably necessary to complete. Moreover, there is no evidence that employees in the SCSO were informed of the reason for Plaintiff's administrative leave at any point in time.

While the Court acknowledges that there may be circumstances when placing an employee on paid administrative leave may dissuade a reasonable worker from engaging in protected activity, these circumstances are not presently before the

---

10. The Court notes that the incident with Detective Morton also occurred seven months prior to Plaintiff being placed on administrative leave.

Court. *See Burlington N.*, 548 U.S. at 69, 126 S.Ct. 2405 (noting that "the significance of any given act of retaliation will often depend upon the particular circumstances").[11]

Finally, without making a formal assertion, Plaintiff appears to contend that the SCSO took an adverse action against her by creating conditions which forced her to resign one year earlier than she originally intended. (*See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 98.) In order to demonstrate constructive discharge, a plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) that the employer did so with the intention of forcing the employee to quit and the employee actually quit. *Logan v. Denny's Inc.*, 259 F.3d 558, 568–69 (6th Cir.2001). To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir.1999). Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. *Id.*

The Sixth Circuit has set forth a number of factors that a court should consider singularly or in combination for the purposes of satisfying the first prong of the constructive discharge inquiry. These include whether the employee suffered a(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan*, 259 F.3d at 569. None of these factors are relevant to Plaintiff's allegations. Moreover, there is no evidence that Defendant intended to cause Plaintiff to resign, that Defendant encouraged her to do so, or that quitting was the foreseeable consequence of Defendant's actions.

Because Plaintiff has failed to establish that she suffered an adverse action as a result of engaging in protected activity, she cannot establish a prima facie case of retaliation. The Court therefore GRANTS Defendant's Motion for Summary Judgment on this ground.

**f. THRA**

Tennessee state courts have "looked to federal case law applying the provisions of the federal antidiscrimination statutes as the baseline for interpreting and applying [THRA]." *Graves v. Circuit City Stores, Inc.*, No. 03A01–9501–CH–00012, 1995 WL 371659, at *2 (Tenn.Ct.App. June 21, 1995) (*citing Brenner v. Textron Aerostructures*, 874 S.W.2d 579 (Tenn.Ct.App.1993)); *Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn.Ct.App.1984); *see also Miller*

---

11. The Court notes that Plaintiff did not present Captain Cobb's email to Janet Buhr until August 21, 2007, the day she was placed on administrative leave and after the decision to do so had already been made; therefore this incident cannot support a causal connection to Plaintiff's retaliation allegation. (Buhr Statement (D.E. 47–1) ¶ 9.) Plaintiff also acknowledges that her father passed away on August 8, 2007 and that she suffered from psychological problems that caused her to forget things and cry uncontrollably at work prior to her being required to undergo a psychological exam on August 21, 2007. (Exhibits in Supp. of Def.'s Mot. Summ. J. at p. 12 of 27; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 80.) Based on these circumstances and the fact that Plaintiff has failed to identify evidence which establishes a causal connection between any alleged protected activity and her required administrative leave on August 21, 2007, the Court finds that such action does not constitute an impermissible retaliatory act.

*v. City of Murfreesboro,* 122 S.W.3d 766, 775 (Tenn.Ct.App.2003) (noting that the THRA runs, essentially, a parallel course with Title VII's antiretaliation provision). Therefore, for the same reasons that the Court grants summary judgment on Plaintiff's Title VII claims of hostile work environment based on sex, race discrimination, hostile work environment based on race, and retaliation, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's parallel THRA claims.

### g. Intentional Infliction of Emotional Distress

Under Tennessee law there are three essential elements to an intentional infliction of emotional distress claim: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997). Although no exact legal standard exists for determining whether particular conduct is so intolerable as to be tortious, Tennessee has adopted and applied the high-threshold standard described in the Restatement (Second) of Torts as follows:

> It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Id.* at 623 (*quoting* Restatement (Second) of Torts § 46 cmt. d (1965)).

Even taking all of Plaintiff's allegations as true, she has failed to demonstrate that Defendant's actions were so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on this claim.

### IV. Conclusion

Because Plaintiff has failed to establish a prima facie case on any of her claims, the Court GRANTS Defendant's Motion for Summary Judgment as to all of Plaintiff's claims. Accordingly, this case is DISMISSED with prejudice in its entirety. Further, the Court DENIES as moot Defendant's pending Motion to Strike Portions of Plaintiff's Recently Filed Documents (D.E. 63).